Filed 7/12/13  Campbell v. Campbell CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JAMES F. CAMPBELL et al., | |
| Plaintiffs and Respondents, | G047181 |
| v. | (Super. Ct. No. 30-2010-00415843) |
| DENNIS CAMPBELL et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, B. Tam Nomoto Schumann, Judge.  Affirmed.

Sean K. Higgins for Defendants and Appellants.

The Walker Law Firm and Joseph A. Walker for Plaintiffs and Respondents.

\*          \*          \*

This appeal concerns a trust amendment and certain other documents executed by Helen Campbell (Helen), the now deceased mother of defendants Dennis Campbell and Doreen McAlister and plaintiffs James F. Campbell, Lawrence S. Campbell, and Laurinda Claus. The parties were originally coequal beneficiaries of a trust executed by Helen and her husband James W. Campbell (father). After father died and Helen was mentally and physically impaired, and while Dennis was a cotrustee, defendants impinged on Helen to amend her trust to give ownership of her home to defendants, to execute a promissory note for $65,000 secured by a trust deed on the home in favor of Dennis, and to execute a 10-year lease with defendants allowing them to live in the house rent free until Helen's death. Plaintiffs petitioned to invalidate all these documents (the 2010 documents) and to remove Dennis as a cotrustee. The court granted the petition and also found defendants should be treated as if they had predeceased Helen.

Defendants appeal, arguing the judgment should be reversed because the statement of decision is legally insufficient and the judgment is not supported by substantial evidence. We disagree and affirm.

FACTS AND PROCEDURAL HISTORY

*1. The Original Trust*

In 1993 father and Helen, parents of the parties, had their family attorney, Timothy Blied, draw up the inter vivos Campbell Family Trust. In 2001 Blied was retained to amend and restate the trust. In 2007 Blied again was retained to amend the trust to change the trustees from father and Helen to Helen, Dennis, and James. All trustees had the power to act independently. From creation of the trust until 2010 all parties were to share equally in the trust assets upon death of both settlors.

2

*2. The Parties' Interactions with Father and Helen*

Doreen lived with her parents in their home (residence) beginning in 1989. She paid rent until 2007. Dennis moved in with his parents in 2001; he paid no rent. James and Laurinda regularly visited Helen. There was no evidence of any falling out between Helen and plaintiffs. Laurinda held Helen's healthcare power of attorney until Helen's death. Dennis testified Helen was not capable of taking care of her finances and Doreen testified Helen had never done so.

Beginning in 2007, without telling James, Dennis comingled his own personal funds with money in a bank account in the name of his parents. These included approximately $19,000 he and a third party won at the racetrack. Father paid the income tax on the winnings. Dennis paid the third party money from this account.

Before father died in 2008 Dennis obtained a line of credit secured by a deed of trust against the residence. Laurinda testified that before father died he and Helen told her they were unhappy Doreen did not pay rent. After father died Helen never told her she intended to amend the trust, give Dennis a $65,000 note secured by a trust deed, or grant defendants a 10-year lease.

*3. Helen's Health*

In 2007 Helen was placed on hospice and, though expected to live only another six months, did not die until May 2010.

From February 2009 up to the date Helen signed the 2010 documents when she was 90 years old, her physical and mental condition declined severely. In September 2009 she had "[c]ognitive decline with impaired short memory and decreased attention span," did not eat well, and could not feed herself or perform any daily activities without assistance. It was difficult for her to answer questions. In October she was diagnosed with "significant cognitive decline." By December she slept up to 20 hours a day.

3

After 2009 Helen could not read and only shadows were visible on the television. By 2010 she could barely see due to macular degeneration. At that time she had a pacemaker and suffered from emphysema, using oxygen continuously. She could not walk and had to use a wheelchair. The day after she signed the 2010 documents her hospice physician reported "[c]ontinued cognitive decline."

### 4. Hiring the Lawyer

According to defendants, in 2009 Helen decided she wanted to amend her trust and asked them to find a lawyer for her. Without telling cotrustee James, Dennis made an appointment for her with attorney Lee Goldberg; Dennis had met him at a bar and grill where Dennis worked. Goldberg[1] testified he sees Dennis only at the restaurant, about twice a month. He is a real estate attorney and has drafted only about 36 estate documents in his 25 years of practice. Doreen also testified she had set up the meeting with Goldberg.

Goldberg did not prepare a retainer agreement, kept no timesheets, and did not bill for his services nor for any costs associated with his services, although he did tell Helen and Dennis the fee would be $750. Dennis testified he thought Goldberg performed the services because he was his friend.

### 5. The Note and Trust Deed

Dennis testified that over 20 years during father's life, father borrowed $65,000 from him. After father died he found Post-it notes with amounts written on them but they did not add up to $65,000. Father never gave Dennis any receipts or signed documents evidencing any loan. Dennis testified he gave the Post-it notes to Goldberg before the latter prepared the promissory note, and he also testified he gave them to him

---

[1] The parties stipulated that in lieu of live testimony, the judge could read all of Goldberg's deposition testimony.

4

afterward. Dennis said he spoke to Goldberg about the loan but also testified he did not even know about the promissory note. Dennis testified Goldberg instructed him to throw away some of the evidence supporting the amount of the loan.

Goldberg testified the only evidence he saw supporting a loan were some handwritten notations, which did not equal $65,000. Moreover, Helen was unable to point to any evidence of owing that amount. Goldberg testified the slips of paper Dennis supplied did not total $65,000 but Helen "was adamant" that she owed him that sum. Goldberg prepared a promissory note for that amount in favor of Dennis and a deed of trust on the residence securing the note.

### 6. The Lease

Goldberg also prepared a 10-year lease in favor of defendants, which required no payment of rent until Helen's death. The term of the lease began in February 2010. Doreen testified the lease was a "complete surprise."

### 7. The Amendment to the Trust

The final document Goldberg prepared was an amendment to the trust, which gave the residence to defendants, eliminating plaintiffs' portion of the gift.

### 8. Execution of the 2010 Documents

Helen signed the 2010 documents on February 8, 2010. Doreen testified she had to help Helen sign the documents because Helen could not see. The only way Helen knew where to sign was the location of Doreen's finger. Doreen also said Goldberg read all the February 2010 documents to Helen. Goldberg testified he did as well. At that time Helen could not hear and did not wear her hearing aids. Doreen "did not pay attention to what [Goldberg] was reading." Goldberg testified Helen did not have anyone assist her in signing the documents and Doreen was not present.

5

Defendants never told James, as cotrustee, or the other plaintiffs about any of Goldberg's visits or that Helen signed the 2010 documents; Goldberg did not provide them with copies of those documents. Dennis informed Goldberg he was a cotrustee but probably did not tell him James was as well.

After Helen died, defendants obtained James's consent to use about $48,000 in a bank account to pay down the line of credit. Under the residual clause of the trust, the money would have been divided equally among the parties.

## 9. *The Petition, Trial, Statement of Decision and Judgment*

Plaintiffs filed a petition for financial elder abuse (Elder Abuse and Dependent Adult Civil Protection Act; Welf. & Inst. Code, §15600 et seq.) (Elder Abuse Act), undue influence, and breach of trust, seeking rescission of the 2010 documents and return of the property. Defendants' cross-petition for a declaration plaintiffs breached the no-contest clause is not part of this appeal.

After trial the court found in favor of plaintiffs and ordered them to prepare a statement of decision. The proposed statement of decision addressed the 11 joint disputed factual issues set out in the joint pretrial statement. Defendants' request for the statement of decision included 47 questions for which they sought a ruling, many of which were included in the original statement of decision.

In response to an objection to the statement of decision, the court ordered plaintiffs to revise the statement of decision to include findings as to Doreen, the burden of proof for each cause of action, and a statement that credible evidence supported each of them, which plaintiffs did. After an objection to the revised statement, the court ordered one additional change, i.e., that Doreen's testimony she did not know the nature of the documents being discussed at the meetings between Goldberg and Helen was not credible. All other objections were overruled. That change was made and judgment was entered.

6

The judgment stated defendants had committed financial elder abuse against Helen and the 2010 documents were a product of undue influence.  All the 2010 documents were cancelled, Dennis was removed as a cotrustee, and defendants were deemed to have predeceased Helen under Probate Code section 259;[2] the court ruled that, pursuant to that section, plaintiffs were entitled to reasonable attorney fees.  The statement of decision also ruled plaintiffs had not violated the no contest clause.

DISCUSSION

*1. Introduction and Basic Legal Principles*

Before we get to the substance of the appeal, we must address the parties' violations of the court rules governing appeals.  California Rules of Court, rule 8.204(a)(1)(C) requires "any reference to a matter in the record" to be supported by a citation to its location.  These citations must be included in both the summary of facts and the argument portion of the brief even if duplicative.  (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16.)

Although both parties included some record references, neither party fully cited to the record, improperly requiring the court to do counsel's work.  (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738 ["'It is neither practical nor appropriate for us to comb the record on [a party's] behalf'"].)  In defendants' case, failure to comply with this rule could have lead to a forfeiture of their arguments.  (*Evans v. CenterStone Development Co.* (2005) 134 Cal.App.4th 151, 166-167.)  We have reluctantly overlooked this deficiency to decide the case on the merits.

Turning to the substance of the appeal, a statement of decision must "explain[] the factual and legal basis for [the court's] decision as to each of the principal

_____

[2]  All further statutory references are to this code unless otherwise stated.

7

controverted issues at trial . . . ." (Code Civ. Proc., § 632.) But it need not make findings on subsidiary issues even if they are material to the ultimate issues. (*Kuffel v. Seaside Oil Co.* (1977) 69 Cal.App.3d 555, 565-566.)

Defendants devote a substantial portion of their briefs arguing the statement of decision was insufficient because it either relied on incorrect legal standards or failed to state a legal standard. They also contend it failed to set out required factual findings for the various causes of action. The material issues here are those set out in the stipulated facts. Even if we look at each cause of action separately, the trial court explained the required legal standards and factual findings to support the statement of decision. Defendants' arguments to the contrary are not persuasive.

### 2. *Undue Influence*

#### a. *Trust Amendment*

Defendants argue the statement of decision failed to set out the legal standard for undue influence concerning the trust amendment. They claim the court incorrectly relied on Civil Code section 1575, which applies to irrevocable inter vivos transfers such as contracts and not to testamentary transfers such as the trust amendment.

Undue influence in a testamentary context "is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96.) It is "extraordinary and abnormal pressure [that] subverts independent free will and diverts it from its natural course in accordance with the dictates of another person." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605, superseded by statute on other grounds as stated in *Rice v. Clark*, *supra*, 28 Cal.4th 89.) "'"[T]he circumstances must be *inconsistent* with voluntary action on the part of the testator" [citation]; and "[the] mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient."' [Citation.]" (*Estate of Sarabia*, *supra*,

8

221 Cal.App.3d at pp. 604-605.) Defendants assert this standard was omitted from the statement of decision as it made a finding Helen's execution of the trust amendment was not based on her free will or true intent.

But this argument is irrelevant because the statement of decision relied on the presumption of undue influence, which supplants the usual burden of proof resting on the party attacking a testamentary document. (§ 8252, subd. (a).) The presumption shifts the burden of proof if the challenger shows "(1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Rice v. Clark*, *supra*, 28 Cal.4th at pp. 96-97.) The trier of fact decides whether the presumption will be applied and if it has been rebutted. (*Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035, 1060 disapproved on another ground in *Bernard v. Foley* (2006) 39 Cal.4th 794, 816, fn. 14.)

The statement of decision set out the standard and the factual basis for the finding. First, Dennis, as cotrustee, had a confidential relationship with Helen. Helen "relied greatly" on both Doreen and Dennis, her children, as caregivers, and, although not mentioned, both lived with Helen for several years. We reject defendants' conclusory claim there is no evidence they pressured Helen.

The second factor, procurement of execution of the amendment, which may be shown by circumstantial evidence (*Estate of Baker* (1982) 131 Cal.App.3d 471, 481), includes the alleged wrongdoers' """"control over the decedent's business affairs, dependency of the decedent upon the beneficiary for care and attention, or domination on the part of the beneficiary and subserviency on the part of the deceased"""" (*ibid*.). Here, as set out in the statement of decision, defendants were extensively involved in procuring the amendment, hiring Goldberg, instead of Helen's usual estate planning lawyer, and scheduling meetings with him. Helen could not hear or see and Doreen had to point to where she should sign documents. Dennis was heavily involved in Helen's financial

9

affairs. This evidence controverts defendants' claim they did nothing more than help Helen find a lawyer and, in accordance with her wishes, attend certain meetings. (Cf. *Estate of Mann* (1986) 184 Cal.App.3d 593, 607 [beneficiaries' selection of lawyer to prepare trust or presence at signing alone not sufficient to support undue influence].)

Contrary to defendants' rather conclusory claim, there are also facts showing they received undue profit, the third factor. Before the amendment, the five children were to share in the house equally. Afterwards, the three plaintiffs were to receive no share. The house was the primary asset of the estate so the effect of the amendment was to virtually disinherit plaintiffs.

Defendants argue undue profit is determined "based on a qualitative assessment of the evidence, not a quantitative one." (*Conservatorship of Davidson*, *supra*, 113 Cal.App.4th at p. 1060.) In other words, "'undue'" depends on "'what profit would be "due."'" (*Ibid*.) There was evidence Helen would not want to amend the trust to cut plaintiffs out of her estate. James was a cotrustee and assisted Helen with some of her finances. He and Laurinda lived near Helen and visited her regularly. Laurinda was Helen's attorney in fact in her health care power of attorney. Thus, under this standard and based on these facts, the trust amendment gave defendants an undue profit.

Defendants assert there was "uncontroverted evidence" of both Helen's true intent and the lack of undue profit that the court failed to consider. They set out nine pages of evidence they claim warrants reversal. This includes testimony from caregivers other than defendants that Helen told them she wanted the house to go to defendants, and Goldberg's testimony he gave Helen several options as to how to divide her estate. They also refer to their own testimony about outings with and care of Helen and a friend's testimony Helen was unhappy plaintiffs did not visit more often.

This argument fails. The court did not have to believe any of this testimony. It is reasonable to infer the court found the evidence suspect given defendants' relationship with Helen. In addition, there was contrary evidence supporting

10

the presumption. Even the testimony of one witness can constitute substantial evidence, despite conflicting testimony from several witnesses. (Evid. Code, § 411; *City and County of San Francisco v. Givens* (2000) 85 Cal.App.4th 51, 56.) The trier of fact evaluates evidence and rules on the credibility of witnesses. It is not our function to reweigh those decisions. (*White v. Inbound Aviation* (1999) 69 Cal.App.4th 910, 927.) Likewise, when the evidence supports two or more reasonable inferences, we may not substitute our conclusion for that of the trial court. (*Ortega v. Pajara Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1043.)

We reject defendants' argument the court erroneously relied on Civil Code section 1575 as the standard for undue influence as to the trust amendment. The court relied on the presumption of undue influence. As set out below, Civil Code section 1575 was the the basis for the finding of undue influence as to the promissory note, trust deed, and lease (other documents).

### b. *Other Documents*

Civil Code section 1575 states undue influence occurs when a party "tak[es] an unfair advantage of another's weakness of mind; or, [¶] . . . tak[es] a grossly oppressive and unfair advantage of another's necessities or distress." (Civ. Code, § 1575, subds. 2, 3.) The court found the other documents were all the product of undue influence by defendants and should be set aside.

Defendants claim there is insufficient evidence to support the finding. They assert seven factors (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123) are required to prove undue influence and maintain the statement of decision makes findings as to none of them. These include things such as a demand a transaction be concluded immediately, discussions of the transaction at an odd time, the lack of a third-party adviser, and the inability to consult such an adviser. (*Id*. at p. 133.) But the very

11

premise of this argument is incorrect. *Odorizzi* does not presume to set out an exclusive list of facts necessary to show undue influence. (*Id*. at p. 133.)

"What constitutes undue influence and what constitutes sufficient proof thereof depend upon the facts and circumstances of each particular case. It 'is a species of constructive fraud which the courts will not undertake to define by any fixed principles, lest the very definition itself furnish a finger-board pointing out the path by which it may be evaded.' [Citation.]" (*Sparks v. Sparks* (1950) 101 Cal.App.2d 129, 135.) Undue influence "involves the use of excessive pressure to persuade one vulnerable to such pressure . . . ." (*Odorizzi v. Bloomfield School Dist*., *supra*, 246 Cal.App.2d at p. 131.) It "may consist of total weakness of mind which leaves a person entirely without understanding [citation]; or, a lesser weakness which destroys the capacity of a person to make a contract even though he is not totally incapacitated . . . ." (*Ibid.*) It "need not be longlasting nor wholly incapacitating, but may be merely a lack of full vigor due to age [citation], physical condition [citation] . . ., or a combination of such factors. The reported cases have usually involved elderly, sick, senile persons alleged to have executed wills or deeds under pressure. [Citations.]" (*Ibid.*)

A review of the evidence set out in detail above and the findings in the statement of decision demonstrates there is substantial evidence to show undue influence. Helen was 90 years old and had "mental deficits," including severe cognitive decline. She slept 20 hours a day. Defendants lived with her and acted as her caregivers part of the time. They secured her attorney, and Doreen had to point to where Helen should sign the other documents because she could not see or hear. The court ruled Doreen's testimony she did not know the contents of the other documents was not credible. Based on this evidence the court reasonably found defendants exerted undue influence on Helen.

In the second argument, defendants claim the finding they did not rebut the presumption of undue influence under Civil Code section 1575 is legally insufficient.

12

Undue influence in this context is "[i]n the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him [or her]." (Civ. Code, § 1575, subd. 1.) Section 16004, subdivision (c) states, "A transaction between the trustee and a beneficiary which occurs during the existence of the trust or while the trustee's influence with the beneficiary remains and by which the trustee obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties. This presumption is a presumption affecting the burden of proof."

"There are certain relations from the existence of which the law will infer special confidence . . . . [Citation.] A confidential relation in fact should be the test. Where a grantor has trust and confidence in the integrity and fidelity of the grantee and the latter takes advantage of the grantor relief will be afforded. [Citation.] One who holds a confidential relationship will be presumed to have taken undue advantage of his trusting friend unless it shall appear that the latter had independent advice and acted not only of his own volition but with full comprehension of the results of his action. [Citation.]" (*Sparks v. Sparks*, *supra*, 101 Cal.App.2d at pp. 135-136.)

The court found Dennis, as cotrustee of the trust, had a confidential relationship with Helen. It also determined the note and the rent free lease gave Dennis an advantage. Dennis failed to meet his burden to show the other documents were not a result of undue influence.

Defendants assert the statement of decision lacked findings showing Helen was not fully informed when she agreed to execute the other documents or that these documents were unfair, claiming there was uncontroverted evidence Helen wanted to execute these documents. They point to testimony of the caregivers and Goldberg that Helen told them Dennis was owed the money. They also maintain the note and trust deed were fair because Dennis had loaned father money over the years. They likewise argue the lease was fair because defendants had to pay on the line of credit and because they

13

had not previously paid rent.  But this testimony is not unrebutted, as discussed above, and again, defendants are asking us to reweigh evidence, a task not within our province.  The statement of decision was sufficient in this regard.

In a related argument, defendants claim there is no substantial evidence Helen lacked contractual capacity.  Under section 811, subdivision (b) and as shown by the evidence already laid out, Helen lacked the capacity to execute the other documents because her mental deficits "significantly impair[ed her] ability to understand and appreciate the consequences of . . . [her] actions with regard to" them.  There was a direct correlation between her deficits and execution of the other documents.  Defendants' claim there was insufficient evidence is another instance of their inappropriate request we reweigh evidence.

### 3. Elder Abuse

#### a. Trust Amendment

Defendants argue the statement of decision finding they engaged in financial elder abuse to procure the trust amendment did not use the correct legal standard.  They claim Welfare and Institutions Code section 15610.30, which sets out the elements of financial elder abuse, does not apply to the trust amendment because it did not transfer any property rights to them.

Under Welfare and Institutions Code section 15610.30 financial elder abuse occurs when a person "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder," among other things, for "wrongful use or or with intent to defraud, or both," or "by undue influence, as defined in Section 1575 of the Civil Code."  (Welf. & Inst. Code, § 15610.30, subd. (a)(1), (2).)  A person "takes, secretes, appropriates, obtains, or retains real or personal property when an elder . . . is deprived of *any* property right, including by means of an agreement, donative transfer, or testamentary bequest . . . ."  (Welf. & Inst. Code, § 15610.30, subd. (c), italics added.)

14

Although ownership of the residence did not vest in defendants at the time Helen signed the amendment, given her medical condition, defendants' control over her, and the fact she died three months after signing the trust amendment, at minimum defendants "secrete[d]" (Welf. & Inst. Code, § 15610.30, subd. (a)(1), (3)) the residence from her. The effect of defendants' undue influence was to deprive Helen of her interest at the time she executed the trust amendment.

### b. Other Documents

As to the other documents, defendants make only a passing reference in one of their headings that there was no substantial evidence of elder abuse "relying exclusively" on undue influence. (Boldface and capitalization omitted.) Failure to make any reasoned legal argument forfeits this claim. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

### 4. Section 259

Defendants maintain that even if they committed elder abuse, full disinheritance under section 259 was erroneous. This argument has no merit.

Section 259 provides four conditions that must be met before disinheritance applies. They are that defendants committed financial abuse (requiring proof by clear and convincing evidence), they acted in bad faith and were "reckless, oppressive, fraudulent or malicious," and Helen was "substantially unable to manage . . . her financial resources or to resist fraud or undue influence" at the time of the abuse and thereafter until her death. (§ 259, subd. (a).) We have already determined these conditions were proven and in this argument defendants do not challenge these conditions, except to state a conclusion there was no financial elder abuse.

As a result of the abuse, defendants may not "receive any property, damages, or costs that are awarded to [Helen's] estate" resulting from an action arising

out of the abuse. (§ 259, subd. (c)(1).) They are also barred from serving as Helen's fiduciary since the will or trust designating them was executed while Helen was unable to manage her finances or resist undue influence of fraud. (§ 259, subd. (c)(2).) In other words, section 259 "does not necessarily disinherit an abuser entirely but rather restricts the abuser's right to benefit from his or her abusive conduct. [Citations.]" (*Estate of Dito* (2011) 198 Cal.App.4th 791, 803, fn. omitted.) The statute "restricts the value of the estate to which the abuser's percentage share is applied and prevents that person from benefiting from his or her own wrongful conduct." (*Id*. at p. 804.) The abusers are considered "to have predeceased the decedent only to the extent the person would have been entitled through a will, trust, or laws of intestacy to receive a distribution of the damages and costs the person is found to be liable to pay to the estate as a result of the abuse." (*Id*. at pp. 803-804, fn. omitted.)

The statement of decision provides that the 2010 documents were procured by defendants' undue influence. It also specifies that, because defendants committed financial elder abuse by taking an interest in Helen's real property by virtue of the lease, they are deemed to have predeceased her. The judgment states defendants are considered to have predeceased Helen and the assets of the trust "are to be distributed accordingly."

Defendants argue they should not be disinherited because they never "took any [of Helen's] property . . . into their own names." They are not correct. They lived in the residence rent free, Dennis received $65,000 under the note secured by a trust deed on the residence, and they "secrete[d]" (Welf. & Inst. Code, § 15610.30, subd. (c)) the residence from her. The 2010 documents were all cancelled and defendants were required to return all the interests they obtained via the 2010 documents.

Section 259 is a forfeiture statute, the purpose of which is "to deter the abuse of elders by prohibiting abusers from benefiting from the abuse. . . . By enacting this statute, the Legislature hoped that the threat of extinguishing inheritance rights, and the financial incentive to others to report abuse, would deter abuse." (*Estate of Lowrie*

16

(2004) 118 Cal.App.4th 220, 229.) In giving effect to a statute we presume the Legislature did not intend absurd results. (*Jurcoane v. Superior Court* (2001) 93 Cal.App.4th 886, 893.)

There would be no need for the statute if defendants could engage in the conduct described here to pressure Helen to transfer the various interests to them and avoid any consequences. Merely cancelling the 2010 documents and then allowing defendants to share in the estate as they would have absent the abuse is no deterrence at all. Defendants would be in no worse position than if they had not employed the undue influence. That result would violate both the spirit and the intent of section 259.

## 5. *Fraud*

Defendants complain the court failed to make a finding as to whether fraud was "an independent cause of action" and challenge the statement of decision for failing to discuss elements or findings of fraud. This argument borders on frivolous. Review of the petition shows there is no fraud cause of action, nor is the judgment for fraud. Therefore, there would be no need to discuss it in the statement of decision or to make factual findings. The statement in the judgment the trust amendment was procured by "fraud/undue influence" is superfluous since the statement of decision supports a finding of undue influence.

## 6. *Testamentary Capacity*

Defendants claim the statement of decision conflates the standard for testamentary capacity with that of contractual capacity in the context of the trust amendment. This is incorrect.

17

Section 6100.5, subdivision (a)[3] provides a person is "not mentally competent to make a will if at the time of making" it the person "does not have sufficient mental capacity to be able to (A) understand the nature of the testamentary act, (B) understand and recollect the nature and situation of the individual's property, *or* (C) remember and understand the individual's relations to living descendants . . . and those whose interests are affected by the will." (Italics added.) Section 6100.5 applies to the capacity to amend a trust by virtue of section 811. (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 731.)

Section 811, cited in the statement of decision, lists the "mental functions" to be considered when a court is making a decision a person "lacks the capacity to . . . to contract . . . or to execute trusts . . . ." (§ 811, subd. (a).) They include "(1) Alertness and attention, including, but not limited to, . . . [¶] (A) Level of arousal or consciousness[ and] [¶] (B) Orientation to time, place, person, and situation." (*Ibid.*) "A deficit in the mental functions listed above may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (§ 811, subd. (b).) The court also pointed to section 810, subdivision (c), which states that a finding a person "lack[s] the legal capacity to perform a specific act" must rest on "evidence of a deficit in one or more of the person's mental functions rather than on a diagnosis of a person's mental or physical disorder."

The statement of decision met these requirements. It laid out the evidence showing Helen's necessity and distress based on her poor health and her heavy reliance on defendants as caregivers. It also found Helen had "weakness of mind" "evidenced by

_____

[3] Contrary to defendants' claim, the statement of decision did not "dismiss" the applicability of section 6100.5, subdivision (a).

18

documented mental deficits that affected her testamentary capacity," which defendants took advantage of. It further specified there was credible evidence Helen "was not oriented to time, place, person and situation in and around February 2010." She slept as much as 20 hours a day around the time she executed the 2010 documents. This, and the evidence she could not read or hear and of her severe cognitive decline at the time she executed the trust amendment, was sufficient to show Helen was mentally incompetent.

The absence of a finding Helen suffered from hallucinations or delusions is inconsequential; that is an alternate factor proving incompetence (§ 6100.5, subd. (a)(2)) and not required. For the same reasons as stated above, we again reject defendants' claim there is uncontroverted evidence to show plaintiffs did not prove the section 6100.5 factors.

*7. Breach of Trust*

The statement of decision found Dennis breached the trust, both as to Helen during her lifetime and as to the plaintiffs after Helen's death. Defendants rely on trust language that Dennis should not be liable for breach of trust if he acts in good faith and without gross negligence. He argues the statement of decision fails to include findings to support these two factors and the evidence shows he was neither grossly negligent nor acted in bad faith. This argument is easily disposed of.

There is not only sufficient evidence, there is overwhelming evidence Dennis did not act in good faith. As set out in the statement of decision, he exerted undue influence to obtain the trust amendment whereby Helen transferred all of the interest in the residence to defendants, to the exclusion of plaintiffs. He procured the $65,000 note in his favor secured by a deed of trust on the residence, a trust asset, and there was substantial evidence there was no consideration for the note. He also procured the lease of the residence on behalf of himself and Doreen, providing they were not obligated to pay rent until after Helen's death. He never revealed his actions or the existence of the

19

2010 documents to James, his cotrustee, or to any of the other plaintiffs who were trust beneficiaries. He fraudulently induced James to agree to use a trust bank account to substantially pay down the line of credit secured by the residence when it would have been his personal responsibility to pay that off. And this is just some of the evidence showing a breach of trust.

Dennis's one contrary argument that he had no intent to breach the trust and did not know the contents of the trust amendment again improperly seeks to have us reweigh evidence. Since he did not act in good faith we need not discuss whether he was negligent since the trust required both elements to be satisfied.

## 8. *Attorney Fees*

The amount of attorney fees to be awarded is within the court's sound discretion, taking into account the type and difficulty of the matter, counsel's skill vis-à-vis the skill required to handle the case, counsel's age and experience, the time and attention counsel gave to the case, and the outcome. (*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.* (1997) 53 Cal.App.4th 152, 168.) An experienced trial judge is best qualified to decide the value of an attorney's services in a given matter, and on appeal we will not reverse that decision unless it is clearly wrong. (*11382 Beach Partnership v. Libaw* (1999) 70 Cal.App.4th 212, 220.) We are not persuaded the trial court abused its discretion in its apportionment of the fees. The fact the court did not consider all of the transactions on which plaintiffs relied to prove elder abuse is irrelevant. In deciding whether to segregate attorney fees, the court does not look at individual pieces of evidence but at the various causes of action.

DISPOSITION

The judgment is affirmed. Plaintiffs are entitled to costs on appeal.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.

21